**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| DAVID SCURA, AND CLIFFORD DAY, Individually and on behalf of all others similarly situated, | Civil Action No. 3:23-cv-680 |
| Plaintiffs, | **COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934** |
| v. | JURY TRIAL DEMANDED |
| BRAD K. HEPPNER, JON R. SABES, STEVEN F. SABES, PETER T. CANGANY, RICHARD W. FISHER, THOMAS O. HICKS, DENNIS P. LOCKHART, BRUCE W. SCHNITZER, THE BENEFICIENT COMPANY GROUP L.P., FOXO TECHNOLOGIES INC., and EMERSON EQUITY LLC. | |
| Defendants. | |

Plaintiffs David Scura and Clifford Day ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by GWG Holdings, Inc. ("GWG") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of court filings in the matter of *In re: GWG Holdings, Inc., et al.*, Case No. 22-90032 (Bankr. S.D. Tex.); (c) review and analysis of press releases and media reports issued and disseminated by GWG; and (d) review of other publicly available information concerning the defendants.

1

## I.      NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired GWG's L Bonds or Preferred Stock of GWG ("GWG securities") between December 23, 2017, and April 20, 2022, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b), 15(c), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Defendants used GWG to carry out a Ponzi scheme, at the expense of GWG's investors. The Defendants diverted hundreds of millions of dollars in GWG investor funds for their own gain, and their actions rendered GWG unable to make required payments to its investors, substantially destroyed the value of GWG securities, and drove GWG into bankruptcy.

3.      GWG's business was founded in 2006 by brothers Steven F. Sabes and Jon R. Sabes. From 2006 through at least 2018, Defendants Steven and Jon Sabes were senior executive officers and controlling shareholders of GWG and its predecessor companies. From its founding through in or about 2018, GWG was primarily in the business of purchasing life insurance policies from insured individuals, with the goal of collecting policy benefits upon the death of the insureds.

4.      GWG raised funds to purchase these life insurance policies primarily by selling GWG stock and bonds to investors. GWG's securities were sold through a network of approximately 140 regional brokers through Defendant Emerson Equity who sold the GWG securities to individual retail investors and retirement savers. These brokers received substantial fees and commissions (at times exceeding 5% of the securities' face value) from GWG for such sales. In addition, many brokers continued selling GWG securities, particularly GWG's L Bonds, despite their known risk and GWG's poor performance outlined in publicly filed documents.

5.      However, by in or about 2017, GWG's business was failing. Insureds were living longer than the projections that GWG had disclosed to investors, resulting in (i) higher costs to maintain the insurance policies in the form of additional premiums, (ii) higher financing costs to obtain additional investor funds to make the required premium payments under the policies, and (iii) a longer wait to collect any eventual death benefits. GWG issued increasing amounts of its own securities to cover its increasing costs, satisfying obligations to old GWG investors with new GWG investor funds. At no time was revenue from the insurance policies that GWG had acquired sufficient to cover GWG's expenses.

6.      According to reporting by the Wall Street Journal, Defendant Jon Sabes wanted to get out of his investment in GWG, and in 2017 he found a match in Defendant Brad K. Heppner. *See* Alexander Gladstone, WALL STREET JOURNAL, *Retail Investors Face $1.3 Billion Hit After Asset Manager's Detour Into Startups* (June 24, 2022); Alexander Gladstone, WALL STREET JOURNAL, *An Asset-Management Merger Ended in Bankruptcy, While Its Architect Got $174 Million* (July 29, 2022).

7.      Beginning on or about December 23, 2017, Defendants put into motion a plan that would see: (i) Defendants Jon and Steven Sabes exiting GWG in 2019 with tens of millions of dollars in GWG investor funds, and additional tens of millions of dollars in funding from GWG for their startup business, Defendant FOXO Technologies Inc.; and (ii) Defendant Heppner gaining control over GWG beginning in 2018 and diverting hundreds of millions of dollars to his company Defendant Ben LP. Defendant Heppner simultaneously diverted GWG investor funds for his own direct benefit, including millions of dollars to pay for private jet travel for his family and maintenance of a 1,500-acre luxury ranch for his personal use. Defendants caused GWG to sell

hundreds of millions of dollars of securities to GWG investors, totaling over $1.2 billion during 2018-2020 alone, in order to finance their scheme.

8.     Defendants' scheme began to unravel in 2021 when, under mounting pressure from various accounting problems, auditor resignations, and an SEC investigation (which remains ongoing and has already resulted in charges against certain brokers), Defendants were forced to pause GWG's sales of securities, leaving it unable to fund its expenses and make required payments to its existing investors. No longer able to continue the scheme, and therefore having no further use for GWG, in 2021 Defendant Heppner promptly resigned from GWG and separated his company Defendant Ben LP from GWG (having combined the companies only three years earlier). Having extracted hundreds of millions of dollars from GWG, Defendants left it a hollowed shell of its former business, saddled with unsustainable debts.

9.     On January 18, 2022 GWG disclosed that it was unable to make certain required payments to its investors. On April 20, 2022, GWG filed for bankruptcy. GWG investors have not received the payments to which they are entitled since at least February 2022.

10.    Throughout the Class Period, Defendants failed to disclose material adverse facts about GWG's business, operations and prospects. Specifically, Defendants failed to disclose to investors that (i) they intended to, and did, misappropriate GWG assets, (ii) GWG's life insurance investment business had failed, and (iii) GWG could only repay prior investors by issuing increasing amounts of securities to new investors. In essence, Defendants had turned GWG into a Ponzi scheme.

11.    As a result of Defendants' scheme and omissions, GWG's resulting inability to make required payments to its investors, and the resulting precipitous decline in the market value

4

of GWG's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

12.    The claims asserted herein arise under Sections 10(b), 15(c), and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), 78o(c)(1), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) as the alleged misstatements entered and subsequent damages took place within this judicial district. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

16.    Plaintiff David Scura, as set forth in the certification filed herewith, incorporated by reference herein, purchased 40 shares of GWG's preferred stock at $1,000.00 per share during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein. Plaintiff Scura is an individual domiciled in Chicago, Illinois.

17.    Plaintiff Clifford Day, as set forth in the certification filed herewith, incorporated by reference herein, purchased $320,000.00 worth of GWG L Bonds during the Class Period, and

suffered damages as a result of the federal securities law violations alleged herein. Plaintiff Day is an individual domiciled and residing in Boca Raton, Florida.

18.     Defendant Brad K. Heppner is the founder, CEO, and Chairman of Defendant The Beneficient Company Group L.P. During April 26, 2019 to June 14, 2021 Defendant Heppner was also GWG's Chairman. Defendant Heppner is believed to reside in or near Dallas, Texas.

19.     Defendant Jon R. Sabes was co-founder, Director, and CEO of GWG Holdings, Inc. until on or about April 26, 2019. Defendant Jon Sabes is also the founder, Chairman, and CEO of Defendant FOXO Technologies Inc. Defendant Jon Sabes is believed to reside in or near Minneapolis, Minnesota.

20.     Defendant Steven F. Sabes was co-founder, Director, and Executive Vice President of GWG Holdings, Inc. until on or about April 26, 2019. Defendant Steven Sabes is also the Chief Operating Officer of Defendant FOXO Technologies Inc. Defendant Steven Sabes is believed to reside in or near Minneapolis, Minnesota.

21.     Defendant Peter T. Cangany Jr. has been a Director with GWG Holdings, Inc. since April 26, 2019. Defendant Peter T. Cangany is also currently a Director of The Beneficient Company Group L.P. Defendant Peter T. Cangany is believed to reside in or near Bellevue, Washington.

22.     Defendant Richard W. Fisher was a Director of GWG Holdings, Inc. from April 26, 2019 until October 21, 2019. Defendant Richard W. Fisher also currently serves as a Senior Partner Director with The Beneficient Company Group, LP. Defendant Richard W. Fisher is believed to reside in or near Dallas, Texas.

23.     Defendant Thomas O. Hicks was a Director of GWG Holdings, Inc. from April 26, 2019 until June 14, 2021. Defendant Thomas O. Hicks is currently a Director of the Beneficient Company Group L.P. Defendant Thomas O. Hicks is believed to reside in or near Dallas, Texas.

24.     Defendant Dennis P. Lockhart was a Director of GWG Holdings, Inc. from May 13, 2019 to June 14, 2021. Defendant Dennis P. Lockhart is currently a Director of The Beneficient Company Group L.P. Defendant Dennis P. Lockhart is believed to reside in or near Atlanta, Georgia.

25.     Defendant Bruce W. Schnitzer was a Director of GWG Holdings, Inc. from April 26, 2019 to June 14, 2021. Defendant Bruce W. Schnitzer is currently a Director of The Beneficient Company Group L.P. Defendant Bruce W. Schnitzer is believed to reside in or near Litchfield, Connecticut.

26.     Defendants Heppner, Jon Sabes, Steven Sabes, Cangany, Fisher, Hicks, Lockhart, and Schnitzer are herein referred to as the "Individual Defendants".

27.     Defendant The Beneficient Company Group L.P. ("Ben LP") is a limited partnership organized in Delaware with its principal offices at 325 N. Saint Paul St., Suite 4850, Dallas, Texas 75201. Ben LP's agent for service of process is Corporation Service Company d/b/a/ CSC-Lawyers Incorporating Service Company 211 East 7th Street, Suite 620 Austin, TX 78701-3218. Ben LP's website states that it "provides private trust solutions, including a unique suite of private trust, lending and liquidity products, to bring liquidity to owners of alternative assets."

28.     Defendant FOXO Technologies Inc. ("FOXO") is a corporation organized in Delaware with its principal offices at 220 South Sixth Street, Suite 1200, Minneapolis, MN 55402. FOXO's agent for service of process is Registered Agent Solutions, Inc., 1010 Dale Street North St. Paul, MN 55117. In securities filings FOXO describes itself as "a technology platform company

focused on commercializing longevity science through products and services that serve the life insurance industry."

29.     Defendant Emerson Equity LLC ("Emerson Equity") is a limited liability company organized in California with its principal office at 155 Bovet Road, Suite 725, San Mateo, CA 94402. Emerson Equity's agent for service of process is an individual named Dominic Julio Baldini located at 155 Bovet Road, Suite 725, San Mateo, CA 94402. During the Class Period, Emerson Equity induced investors to buy GWG's L Bonds without disclosing the material risks and bonds' illiquid nature.

## IV.   DEFENDANTS' SCHEME TO DEFRAUD GWG INVESTORS FOR THEIR PERSONAL GAIN

30.     Throughout the Class Period, the Individual Defendants participated in a scheme to defraud GWG investors for their own gain. Defendants' actions, in essence, constituted a Ponzi scheme. Through their control over GWG, the Individual Defendants caused GWG to sell increasing amounts of its securities to investors. Defendants used substantial portions of the proceeds from the sale of GWG securities to repay prior GWG investors, who GWG could not otherwise repay with insufficient revenue from its failing business. Defendants also diverted substantial portions of the proceeds from the sale of GWG securities for Defendants' own private use.

31.     Defendants carried out their scheme through a highly complex and opaque series of financial transactions throughout the Class Period. These were designed to give the appearance of legitimate business transactions, while concealing the true nature of Defendants' scheme.

32.     In recent reporting, the Wall Street Journal describes Defendants' scheme as follows:

> Bond salesmen working out of strip malls across America pitched GWG Holdings Inc. as a good investment. The company would use money raised from bond sales

to buy life-insurance policies from people who wanted cash up front, then collect the payouts when those people died. Investors, many of them elderly and retired individuals, put $1.3 billion into the bonds.

*What many of these retail investors didn't know was that GWG's founders and a board director would each use the money to fund and launch their own startup ventures, then move them out of the investors' reach*, according to people familiar with the matter. The roughly 27,000 individuals who bought GWG's unique debt securities, known as L Bonds, are now facing huge potential losses – for many, their retirement nest eggs.

Alexander Gladstone, WALL STREET JOURNAL, *Retail Investors Face $1.3 Billion Hit After Asset Manager's Detour Into Startups* (June 24, 2022).

33.    In a follow up article, the Wall Street Journal further reported that:

Mr. Heppner and his associates gained effective control of GWG in 2019, as he sought to tap into a nationwide network of broker-dealers that had sold the company's bonds for years to individual investors, many of them elderly and retired, according to people familiar with Mr. Heppner's strategy. *After Mr. Heppner became GWG's chairman*, the company used that network to ramp up its bond sales. As it repaid some earlier investors, *GWG also transferred $230 million to Beneficient Co. Group LP, a financial-services startup founded and led by Mr. Heppner.*

*Much of those capital contributions from GWG were then distributed to Mr. Heppner and his affiliated business entities, helping him repay debt he had incurred to buy and develop a nearly 1,500-acre ranch in Texas, and providing him with access to private jets* among other benefits, according to people familiar with the matter and internal documents reviewed by the Journal.

Alexander Gladstone, WALL STREET JOURNAL, *An Asset-Management Merger Ended in Bankruptcy, While Its Architect Got $174 Million* (July 29, 2022).

34.    The Wall Street Journal reported that since 2018 GWG had raised over $1 billion from investors, with $813 million going to repay prior investors, $230 million going to Defendant Ben LP, $197 million lost through operating expenses, $43 million going to Defendants Jon and Steven Sabes, and $28 million going to Defendant FOXO.

35.     The Wall Street Journal further reported that GWG is now a mere shell of its former business, and that despite its large contributions to Defendants Ben LP and FOXO, GWG has relinquished control over them:

> GWG no longer controls either of the startup ventures. Mr. Heppner, Mr. Sabes, and their associates carved out both ventures as independent entities shortly before the company collapsed into bankruptcy in April.
>
> ***The judge overseeing the court proceedings in Houston said he had never before seen a company give up control of everything it owns before seeking chapter 11 protection***.

36.     GWG had 160 employees as recently as December 2020. It now has two employees.

37.     The business combination between GWG and Ben LP came about as a way for the Defendants to pursue their own financial self-interest at the expense of GWG investors. Through this business combination and the accompanying series of complex financial transactions, (i) Defendants Jon and Steven Sabes were able to cash out of their failing investment in GWG's life insurance investment business while obtaining funding for the business of Defendant FOXO which was under their control, and (ii) Defendant Heppner was able to obtain funding for Defendant Ben LP which was under his control. Because none of GWG, Defendant FOXO, or Defendant Ben LP operated at a profit, the source for substantially all of this funding was the contributions made to GWG by its investors.

38.     As reported by the Wall Street Journal:

> Mr. Sabes wanted to get out of his investment in GWG, according to these people, and focus entirely on his DNA testing venture . . .
>
> In 2017, Mr. Sabes found a match in Mr. Heppner . . .
>
> Mr. Heppner's venture, Beneficient, was at the time a fledgling startup that aimed to help wealthy people and institutions monetize illiquid assets they owned . . . To make it a reality, he needed a ready way to raise capital and accumulate assets under management, according to people familiar with the startup.

> In GWG, ***Mr. Heppner found a company*** that had proven itself at raising capital, with an established network of around 140 bond dealers throughout the country, ***adept at selling securities to individual investors willing to bet on unusual assets***.
>
> ***And the Sabes brothers found a way to cash out***.

39.     Defendant Heppner came to control GWG in a series of transactions between GWG, Ben LP, and private equity firm Paul Capital Advisors ("Paul Capital"). The transactions were planned and executed over 2017-2019. These transactions are now the subject of a pending lawsuit by Paul Capital against Defendant Ben LP and various related parties (Delaware Chancery Civil Action No. 2022-0167-SG).

40.     In 2017 Paul Capital sought to exit its private equity business, and intended to sell certain illiquid, privately held investment assets having a net asset value of approximately $500 million ("Paul Capital Investments"). At the same time, Defendants Heppner and Ben LP (which was more of a concept than an actual business, lacking any substantial assets or operations) wanted to enter the alternative investments business, and sought to acquire the assets being sold by Paul Capital. However, Defendants Ben LP and Heppner had no way to come up with $500 million on their own.

41.     On September 1, 2017 Paul Capital and Defendant Ben LP agreed to a complex series of transactions under which, in summary (i) Defendant Ben LP would gain control over the Paul Capital Investments, (ii) Paul Capital would be paid in equity units of Defendant Ben LP, and (iii) Defendant Ben LP committed to list its equity units on a U.S. exchange and to auction its units for cash in advance of such listing, and (iv) in this manner, Paul Capital was supposed to receive approximately $500 million in cash. Paul Capital was never paid in full and is suing Defendant Ben LP and its affiliates to recover the shortfall.

42.     On December 23, 2017, Paul Holland (a middleman in the Paul Capital / Ben LP transactions, and a friend of Defendant Heppner) informed Paul Capital that the auction of Defendant Ben LP's equity units had generated a winning "bid," and that the winning "bidder" was GWG.

43.     This "bid" from GWG made no business, economic, or strategic sense, and represented an abrupt departure from the business plans previously disclosed to GWG's investors of purchasing life insurance policies from insureds in order to collect death benefits. At year-end 2017 GWG estimated the fair value of its insurance policies to be $650 million, so acquiring a $500 million portfolio of illiquid private equity investments would radically change its business. Moreover, like Defendant Ben LP, GWG did not have $500 million with which to fund the transactions. Substantially all of GWG's assets were tied up in operating its failing life insurance investment business. Defendants Jon and Steven Sabes lacked relevant experience, and had no intention, to operate a private equity business.

44.     In reality, GWG's "winning bid" for the Defendant Ben LP equity units (substantially all of whose value derived from the Paul Capital Investments that Ben LP would obtain as part of the same overarching transaction) was the beginning of Defendants' fraudulent scheme to divert GWG investors' funds to their own private use. The bid was engineered by Defendant Heppner as a means to obtain control over the Paul Capital Investments and simultaneously obtain control over GWG's assets and its network of brokers and investors to raise additional funds. Defendants Jon and Steven Sabes agreed to participate in the scheme in order to cash out of GWG's failing life insurance investment business.

45.     Following the beginning of Defendants' scheme in 2017, Defendants Heppner, and Jon and Steven Sabes caused GWG to issue large and increasing amounts of securities to GWG's

investors, representing a dramatic increase from GWG's prior issuance. In 2018 GWG received proceeds of $264 million from the issuance of debt securities, and $106 million from issuance of preferred stock. In 2019 GWG received proceeds of $403 million from issuance of debt securities. And in 2020 GWG received proceeds of $440 million from issuance of debt securities. In the nine months, which ended September 30, 2021, GWG received proceeds of $155 million from issuance of debt securities (GWG could not sell securities for much of 2021 due to its inability to make required financial reports). On April 20, 2022, GWG filed for Chapter 11 bankruptcy.

46.     The deal between GWG and Defendant Ben LP was first announced to GWG's public investors on January 18, 2018. After a series of delays and amendments to their agreements, GWG and Defendant Ben LP completed the first of two closings pursuant to the agreements on August 20, 2018.

47.     In the midst of these transactions, Defendants Jon and Steven Sabes extracted substantial investor funds from GWG. Because GWG operated at a loss at all times, it historically did not pay dividends on its common stock, and repeatedly disclosed to investors that it did not expect to do so in the foreseeable future. However, on August 10, 2018, GWG declared a special dividend of $4.30 per share of common stock payable to shareholders of record on August 27, 2018. Based on the approximately 5.8 million shares of GWG common stock outstanding at the time, the total dividend payment amounted to over $25 million. Based on their combined ownership of approximately 75% of GWG's common stock at the time, Defendants Jon and Steven Sabes received approximately $18 million from this dividend. This dividend was funded not by GWG's profits (there were none), but by the sale of preferred stock to GWG investors.

48.     After further delays and modifications to the terms of the agreement between GWG and Defendant Ben LP, they completed the second and final closing on December 28, 2018.

49.     Promptly thereafter, Defendants arranged for the exit, and additional payout, of Defendants Jon and Steven Sabes. On April 16, 2019 GWG announced that Defendants Jon and Steven Sabes had entered into a Purchase and Contribution Agreement with Defendant Ben LP, pursuant to which, on April 26, 2019: (i) Defendants Jon and Steven Sabes sold and transferred all of the shares of GWG's common stock held directly and indirectly by them and their immediate family members to affiliates of Defendants Ben LP and Heppner, (ii) all seven members of GWG's Board of Directors resigned as directors of GWG, and 11 individuals designated by Defendant Ben LP were appointed as directors of GWG, including Defendants Heppner, Cangany, Hicks, Lockhart, and Schnitzer, (iii) Defendants Jon and Steven Sabes resigned from all officer positions with GWG and its subsidiaries except for their positions with FOXO's predecessor companies, (iv) Defendants Jon and Steven Sabes received $25 million in cash, as well as equity interests in an affiliate of Defendant Ben LP, and (v) GWG, under the control of Defendant Ben LP, would spin off the predecessor companies of Defendant FOXO and provide them with $20 million of funding over two years.

50.     In total, Defendants Jon and Steven Sabes took $43 million in cash and $20 million in promised funding for Defendant FOXO, in addition to other valuable consideration, upon their exit from the failing GWG in 2019.

51.     Like Defendants Jon and Steven Sabes, Defendant Heppner also diverted GWG investors' funds to further his own private interests. According to the Wall Street Journal, in connection with the 2017-2019 agreements and transactions among Defendant Ben LP, GWG, and Paul Capital, Defendant Heppner obtained tens of millions of dollars in cash and property, for which GWG's investors were the ultimate source of funds:

> As part of those transactions, ***Beneficient took out $20.2 million in additional debt that it used to purchase a technology company owned by Mr. Heppner***, according

to people familiar with the matter and a 2019 corporate document reviewed by the Journal.

*The technology assets were more than a decade old and were soon written off*, people familiar with the matter said. Around the time of the deal with Paul Capital, *Beneficient also distributed to Mr. Heppner net assets of $59.1 million related to certain "ranch and ranch-related business activities,"* and later listed them on Beneficient's income statement as "discontinued operations," according to the corporate document.

The ranch referred to in the document is the Bradley Oaks Ranch in Bradford, about 90 miles southeast of Dallas, people familiar with the matter said.

*The debt that Beneficient borrowed to buy the technology company from Mr. Heppner, as well as to purchase and develop the ranch, would later be repaid following the merger with GWG with funds raised from its bond sales*, according to people familiar with the matter.

52.     According to the Wall Street Journal's reporting, the Dallas-area property that Defendant Heppner obtained in this manner is a luxury ranch, "including swimming pools, horse stables, ponds stocked with fish, and miles of trails for hiking, biking and horseback riding." Despite distributing it to Defendant Heppner, Defendant Ben LP continued to pay millions of dollars per year to fund "the maintenance of the ranch, which has a staff of full-time employees, including chefs, groundskeepers and professionals who maintain the equestrian facilities." According to the Wall Street Journal, "[w]hile the ranch occasionally hosts college students doing ecological research, it is used almost entirely for the benefit of Mr. Heppner's family, friends and business associates."

53.     The Wall Street Journal reported that Defendant Ben LP also paid millions of dollars per year for Defendant Heppner and his family to undertake personal travel by private jet:

Beneficient has also made recurring payments to an entity that Mr. Heppner controls, according to people familiar with the matter, called Bradley Capital Co. LLC. Beneficient is "required to reimburse Bradley Capital for out-of-pocket expenses incurred by Bradley Capital employees, including reimbursement for private travel including the family members of designated executives of Bradley Capital for both business and personal use," according to securities filings.

>**Beneficient contributed $9.4 million to Bradley Capital between 2018 and 2021**, the filings show.
>
>**People familiar with the matter said that the money was used to pay for Mr. Heppner and his family and associates to fly in private jets, including frequent trips to Southern California**.

Those funds were also ultimately derived from the contributions of GWG's investors.

54.     Also as reported by the Wall Street Journal, Defendant Heppner's equity in Defendant Ben LP was converted into a $72 million debt facility in 2018, which was consolidated with other debt on Defendant Ben LP's balance sheet held by an entity associated with Defendant Heppner. Defendant Heppner and his affiliates then received "**payments of at least $156.5 million . . . with help from the capital contributions Beneficient received from GWG**."

## V.   DEFENDANTS HEPPNER, JON SABES, AND STEVEN SABES EMPLOYED A NETWORK OF BROKERS TO FACILITATE THEIR SCHEME TO DEFRAUD INVESTORS FOR THEIR OWN PERSONAL GAIN

55.     In order to facilitate the series of self-interested transactions between GWG and Ben LP, and fund unprecedented dividends, Defendants Jon and Steven Sabes caused GWG to increase the quantity and frequency of securities already being sold to investors.

56.     To raise an ample amount of funds to allow GWG to complete their transaction with Ben LP, launch Defendant FOXO, fund the lavish lifestyle of Defendant Heppner, while providing unprecedented dividend payments to Defendants Jon and Steven Sabes, a network of broker-dealers was necessary to tout and sell GWG securities to the Plaintiffs, class members, and thousands of other investors.

57.     The Individual Defendants employed brokers across the United States, including Defendant Emerson Equity to sell GWG's L Bonds, which were illiquid and highly risky.

58.     GWG's L Bonds were debt securities that were supposed to finance GWG's purchase of life insurance policies on the secondary market. The concept behind the L Bonds was

to use the investors' funds to purchase the life insurance policies, and then repay those investors with distributions received from the life insurance policies purchased once the holder passed away.

59.     According to Registration Statements filed with the SEC for GWG's L Bonds, Defendant Emerson Equity played a key role in promoting and selling L Bonds to Plaintiffs, class members, and other investors during the Class Period. A Registration Statement filed with the SEC on May 15, 2020 summarizes Emerson Equity's role in the sale of GWG's L-Bonds as follows:

> The L Bonds will be offered and sold on a best-efforts basis by Emerson Equity LLC, a registered broker-dealer and member of the Financial Industry Regulatory Authority ("FINRA"). Emerson Equity will be our dealer manager for the L Bonds in this offering for purposes of the Securities Act of 1933, as amended. Our dealer manager will enter into participating dealer agreements with certain other broker-dealers that are members of FINRA, referred to as "selling group members," to authorize those broker-dealers to sell our L Bonds.

> We will pay Emerson Equity a selling commission ranging from 0.75% to 5.00% of the principal amount of L Bonds sold, depending on the L Bonds' maturity date. We will also pay Emerson Equity additional compensation consisting of those items set forth in footnote (1) to the table below. The dealer manager will share its commissions and additional compensation, other than its dealer manager fee, with selling group members pursuant to the terms of each participating dealer agreement.

60.     In addition to sales completed directly through their own employed brokers and leadership, including their CEO and CCO, Dominic Baldini, Emerson Equity partnered with multiple other broker-dealers and their firms to sell and promote GWG's L Bonds to class members during the Class Period.

61.     Regardless of the pressure placed on broker-dealers by GWG to promote and sell their L Bonds, and the necessity of such sales to provide a continual influx of capital to fund their self-interested transactions, the uncertainty and risk associated with GWG's L Bonds was no secret to Defendants Emerson Equity. As disclosed in the L Bond's 2020 Prospectus, "The L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment." As if such warning was insufficient to put Emerson Equity on notice of the

investment's limited suitability, the quality of the L Bonds and past performance of GWG should have indicated their extreme risk and unlikely success.

62.     First, the L Bonds were not rated by any bond rating agency to determine the credit risk associated with the bond and its issuer. Next, according to *SEC v. Western Int'l Securities, Inc. et al*, Case No. 2:22-cv-04119 (C.D. Cal. June 15, 2022), an enforcement action against broker-dealers selling GWG's L-Bonds, "GWG [had] a history of net losses and has not generated sufficient operating and investment cash flows to funds its operations. For the year ended December 31, 2019, GWG posted a net loss from operations of $79.6 million and negative operating cash flow of $142.8 million." Lastly, even after a series of transactions that completely reconstructed GWG's business from the acquisition of life insurance policies to alternative investments, Defendant Emerson Equity increased the frequency and amount of L Bonds sold to investors. GWG's escalation in L Bond sales through Defendant Emerson Equity facilitated their transactions with Ben LP, which could only be explained as a series of transactions designed to allow Defendant Heppner to line his pockets with investor funds and support the exits of Defendants Jon and Steven Sabes.

63.     In an article addressing broker-dealers' aggressive sales efforts, author Bruce Kelley highlighted the red flags surrounding GWG:

> There were plenty of other red flags about GWG bonds, which paid brokers handsome commissions when they sold them to clients. In 2019, GWG twice told the SEC and the public in filings it wasn't going to be able to file its quarterly or annual financial statements on time, always a danger sign. And when the company eventually filed an annual report in March 2020, it warned of "several material weaknesses" linked to, among a list of items, the financial reporting process and insufficient accounting resources.

> In that same time period of 2018 and 2019, GWG undertook a complicated financial transaction with the Beneficent Company Group, an unrelated company, to create a start-up financial services business with the aim of diversifying GWG.

Beneficient's management eventually took over GWG, only to separate from the company….

*That's a ton of noise for financial advisers to make sense of in order to recommend or sell a product. But broker-dealers and their reps kept selling GWG's life settlement-backed bonds, marketed as L Bonds, despite all the accounting and reporting static.*

Bruce Kelley, Investment News, *Broker picked wrong time to boost bet on GWG bonds* (May 11, 2022).

64.     Despite these evident red flags surrounding the stability and suitability of GWG's L Bonds, broker-dealers nationwide, including those employed by Defendant Emerson Equity, sold these L Bonds to retirees and retail investors whose investment objectives did not include speculation.

65.     Knowing that GWG depended on debt financing, such as L Bonds, to fund their operations, coupled with the potential for large commissions based on the amount of L Bonds sold, Defendant Emerson Equity blindly touted GWG's L Bonds as safe investments earning high interest for investors. In fact, in the wake of GWG's serious losses in 2019, broker-dealers commissioned by Defendant Emerson Equity even urged long-time GWG investors to re-invest in GWG and purchase additional L Bonds while remaining silent on the state of GWG and continuing to collect his generous commissions.

66.     Without a rating by any bond agency and given the current state of GWG at the time the investors were told to purchase L Bonds, Defendant Emerson Equity manipulated investors to invest in exchange for commission fees by promoting GWG's L Bonds as safe investments suitable for retail investors and retirees.

67.     Defendant Emerson Equity also withheld material information from investors including, SEC investigations into the business of GWG, its history of losses and perpetual

suffering due to the self-interested transactions between Defendant Heppner and Jon and Steven Sabes, and the true use of investor funds to pay life insurance premiums and high-yield interest to other L Bond investors rather than its intended purpose to purchase life insurance policies from consumers.

68.     Unfortunately, GWG, unable to fully recover from their transactions with Ben LP and payouts to Jon and Steven Sabes, could not continue selling enough L Bonds or other securities to generate enough funds to continue repaying prior investors. On January 15, 2022, investors were informed in GWG's Form 8-K that they "did not make the January 15, 2022 interest payment of approximately $10.35 million and principal payments of approximately $3.25 million with respect to L Bonds…" and would be suspending further sales of L Bonds. GWG filed Chapter 11 bankruptcy a little over three months later on April 20, 2022.

69.     Defendant Emerson Equity fraudulently induced investors to relinquish their retirement funds to supply capital to a company they knew or should have known was operating at a loss. In exchange for the opportunity to receive considerable commissions based on the sale of GWG's L Bonds and preferred stock, the above-mentioned brokers enticed unsuitable investors to part with their funds with the promise of substantial returns.

## VI.     DEFENDANTS HEPPNER AND BEN LP ABANDON GWG AMID AUDITOR RESIGNATIONS, ONGOING SEC INVESTIGATIONS, AND GWG'S INABILITY TO CONTINUE ISSUING SECURITIES

70.     Shortly after Defendants began their scheme and proceeded to divert the assets contributed to GWG by investors for their own private use, GWG ran into trouble with its auditors and with the SEC. Having gained control over GWG and its investors' funds in 2018 and 2019, Defendants Heppner and Ben LP abruptly separated themselves from GWG in 2021 once it became clear that they could no longer use GWG to obtain additional investor funds.

71.     On April 2, 2019, GWG reported that it would not timely file its 2018 annual report on SEC Form 10-K, due in part to accounting complications arising from its agreements with Defendant Ben LP:

> Due to a delay in (i) finalizing the accounting for certain assets and liabilities exchanged pursuant to the Amended and Restated Master Exchange Agreement, dated January 18, 2018, as amended, between the Registrant and The Beneficient Company Group, L.P., among others, and (ii) completing the evaluation of fair value of our life insurance policies and recording a change in value expected to be taken in the fourth quarter of fiscal 2018 (see note 22 (Subsequent Event) to the financial statements included in the Registrant's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission on November 19, 2018), the Registrant was not able to complete its financial statements as of and for the year ended December 31, 2018 within the prescribed time period without unreasonable effort and expense.

72.     GWG was forced to temporarily suspend its issuance of securities, due to its delay in making required SEC filings. GWG ultimately filed its 2018 Form 10-K on July 9, 2019.

73.     Shortly thereafter, GWG disclosed that "On August 5, 2019, GWG Holdings, Inc. . . . received oral notice from its registered public accounting firm, Baker Tilly Virchow Krause, LLP ("Baker Tilly"), that Baker Tilly would decline to stand for re-appointment as the Company certifying accountant for fiscal year 2019." At the same time, GWG announced the engagement of Whitley Penn LLP as its new auditor.

74.     Mere days later, on August 15, 2019, GWG disclosed that it would be unable to timely file its second quarter 2019 quarterly report on SEC Form 10-Q, once again due to accounting complications arising from its agreements with Defendant Ben LP:

> Due to (i) the timing of the Registrant's recent transition to a new independent registered public accounting firm, and (ii) the Registrant's continued evaluation of the appropriate accounting treatment for the purchase and contribution transaction completed in April 2019 (the "Purchase and Contribution Transaction"), the Registrant was not able to complete its financial statements as of June 30, 2019 and for the three and six months then ended within the prescribed time period without unreasonable effort and expense.

75.     On September 23, 2020, GWG announced that it would replace Whitley Penn as auditor, after barely one year, with Grant Thornton LLP. Similarly, little more than one year after its appointment as GWG's auditor, on December 31, 2021 Grant Thornton notified GWG that it would not stand for reappointment.

76.     Since October 6, 2020 GWG has been responding to an investigation by the SEC's Division of Enforcement, in which the SEC has requested information regarding GWG's investment products, the consolidation for financial reporting purposes of Defendant Ben LP by GWG, goodwill valuation, related party transactions, and GWG's accounting related to life insurance policies. Defendants did not disclose the investigation to investors until November 2021. The SEC's investigation remains ongoing.

77.     The SEC has also been investigating brokers that sold GWG securities to investors. On June 15, 2022 the SEC charged registered broker-dealer Western International Securities, Inc. and five of its brokers with violating Best Interest Obligation regulations (commonly referred to as Regulation Best Interest or Reg BI) when they recommended and sold GWG securities to retirees and other retail investors.

78.     On February 15, 2021 GWG "submitted two questions to the Securities and Exchange Commission's . . . Office of the Chief Accountant ('OCA') on February 15, 2021." GWG would not disclose this fact to investors until months later on July 7, 2021, when it stated that "The questions submitted by the Company to OCA were (1) whether the December 31, 2019 transaction resulted in GWG obtaining control of The Beneficient Company Group, L.P. . . . in a transaction that constituted a change-in-control of Ben by entities not under common control, and (2) whether Ben was required to consolidate any of the ExAlt Plan trusts." On April 1, 2021 GWG disclosed that it could not timely file its 2020 annual report because "the Company requires

additional time to complete its financial statements and related disclosures." GWG was once again forced to suspend issuance of securities as its auditors and the SEC worked to resolve these accounting issues.

79.     On August 3, 2021 GWG disclosed that its previously issued financial statements "should no longer be relied upon," and that this conclusion was "based upon the resolution of the consultation process with the SEC's Office of the Chief Accountant."

80.     After Defendant Heppner had diverted substantial GWG investor funds for his own personal use, with GWG now unable to sell additional securities to investors, and amid the series of accounting issues, auditor resignations, and SEC investigations following the merger of GWG and Defendant Ben LP, Defendants Heppner and Ben LP sought to extricate themselves from GWG.

81.     On June 11, 2021, Defendant Heppner resigned as director and Chairman of GWG, effective on June 14, 2021. He had become Chairman of GWG only two years earlier in April 2019.

82.     On August 25, 2021 GWG announced that it had entered into a term sheet agreement with Defendant Ben LP, outlining a series of transactions which would result in, among other things, Defendant Ben LP no longer being a consolidated subsidiary of GWG, and GWG giving up its rights to appoint directors of an affiliate of Ben LP.

83.     On November 15, 2021 and December 3, 2021 GWG announced further steps in Defendant Ben LP's separation from GWG, including GWG's agreement to certain changes to the organizational documents of Defendant Ben LP. GWG further announced that it had agreed to accept limited partnership units in Defendant Ben LP in full satisfaction of a $202 million debt owed by Defendant Ben LP to GWG.

## VII. THE RISKS CONCEALED BY DEFENDANTS MATERIALIZED, CAUSING GWG'S INABILITY TO REPAY ITS INVESTORS AND ITS BANKRUPTCY

84.     Defendants' fraudulent scheme ultimately collapsed once GWG was no longer able to continue issuing increasing amounts of securities in order to repay prior investors.

85.     GWG temporarily ceased its sale of securities in April of 2021 because it was unable to timely file its 2020 Form 10-K. GWG subsequently filed its 2020 Form 10-K on November 5, 2021 and resumed selling securities, however GWG did not manage to sell similar quantities of securities as it had done previously. After Grant Thornton's resignation as GWG's auditor on December 31, 2021, GWG was once again forced to suspend its issuance of securities.

86.     On January 18, 2022, GWG disclosed that it "did not make the January 15, 2022 interest payment of approximately $10.35 million and principal payments of approximately $3.25 million with respect to its L Bonds". On that day, GWG's common stock closed at $5.65 per share, a loss of 27.7% as compared to the prior trading day's closing price.

87.     On January 27, 2022 the Wall Street Journal reported that GWG was "seeking rescue financing in an effort to avoid bankruptcy after accounting issues and the resignation of its auditor prevented it from selling its products." On that day, GWG's common stock closed at $2.95 per share, a loss of 20.5% as compared to the prior trading day's closing price.

88.     On February 14, 2022 GWG announced that it was working with "financial and legal advisors hired to assist the Company's Board of Directors and management in identifying and evaluating restructuring alternatives" and that it had "paused L Bond sales and will not make monthly interest and maturity payments on its L Bonds, or dividends on the Redeemable Preferred Stock and Series 2 Redeemable Preferred Stock, while continuing to defer requests for redemptions." On that day, GWG's common stock closed at $3.22 per share, a loss of 13.8% as compared to the prior trading day's closing price.

89.     On April 20, 2022, GWG filed for Chapter 11 bankruptcy. The bankruptcy case remains ongoing. *In re: GWG Holdings, Inc., et al.*, Case No. 22-90032 (Bankr. S.D. Tex.).

90.     GWG investors have not received the payments to which they are entitled since at least February 2022, and the value of their GWG securities has been substantially destroyed.

## VIII.  MATERIAL OMISSIONS AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

91.     Throughout the Class Period, Defendants failed to disclose material adverse facts about GWG's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that (i) they intended to, and did, misappropriate GWG assets to assist Defendants Heppner, and Jon and Steven Sabes launch their start-up companies, repay Ben LP's debt incurred from the transaction with Heppner's tech company, and funnel investor funds through Ben LP to fund Heppner's luxurious ranch and use of private jet travel; (ii) GWG's life insurance investment business had failed; and (iii) GWG could only repay prior investors by issuing increasing amounts of securities to new investors. In essence, Defendants had turned GWG into a Ponzi scheme.

92.     In addition, throughout the Class Period, Defendant Emerson Equity failed to disclose to investors that (i) GWG's L Bonds had not been rated by any bond agency, while blindly touting them as safe investments, (ii) GWG was operating at a loss during the Class Period, and instead of informing Plaintiffs, class members, and other investors of GWG's failing business, investors were encouraged to invest and re-invest their funds, and (iii) the Individual Defendants had entered into a series of self-interested transactions that completely altered GWG's business structure, which resulted in the pay outs of over $60 million in cash and promised funding to Defendants Jon and Steven Sabes and their start-up, Defendant FOXO. Further, the above-mentioned Defendants misrepresented the safety and suitability of GWG's L Bonds by (i) advising

and describing the L Bonds as "safe" investments with potential to receive high returns from interest payments, and (ii) encouraging unsuitable investors to invest their retirement in illiquid, risky bonds.

93.     Defendants' actions to conceal the true nature of their actions constituted a scheme to defraud investors. This scheme consisted in substantial part of Defendants orchestrating numerous complex transactions lacking in *bona fide* business purposes, which were designed to enrich the Defendants, hide their misconduct from investors, and leave GWG in ruins to the detriment of its investors.

94.     As a result of the foregoing scheme and material omissions, Defendants' positive statements about GWG's business, operations, prospects, and L Bond safety and suitability were materially misleading to reasonable investors.

95.     On January 18, 2018, the Individual Defendants caused GWG to issue a press release regarding the planned combination of GWG and Defendant Ben LP. The press release quoted Defendant Jon Sabes as stating:

> We are pleased to announce a strategic relationship with one of the most innovative companies in the alternative asset industry, . . . BEN is partnering with GWGH because they've identified the life insurance asset class as a key enhancement to their diversified endowment portfolio of high-quality alternative assets for which they provide loans and liquidity. And while GWGH will continue to execute our announced strategies to our utmost capacity, we also look forward to rolling out BEN's innovative alternative asset liquidity products to independent broker-dealers and RIAs once BEN obtains its pending regulatory approvals.

96.     The January 18, 2018 press release quoted Defendant Heppner as stating:

> GWG Holdings is the perfect partner for us as we execute on our business plan and expand our product offerings . . . We have been committed to adding the life insurance asset class to our business plan and our mix of alternative asset classes that we administer and lend against. GWGH's expertise in the life insurance secondary market, as well as management's commitment to growth and innovation, blend perfectly into the emerging opportunity to provide liquidity and administrative services to the alternative asset investors we serve.

97.    On March 29, 2018 the Individual Defendants caused GWG to file its 2017 annual report on SEC Form 10-K, which was signed by Defendants Jon and Steven Sabes. The 10-K stated:

> We are a financial services company committed to transforming the life insurance industry with disruptive and innovative products and services . . . We are working to enhance and extend our business in the life insurance industry through continued innovation in our products and services, including the application of advanced technology. Finally, we entered into a strategic relationship with The Beneficient Company Group, L.P. that we expect to provide a significant increase in assets, common shareholder equity and earnings.

98.    On April 16, 2019 Defendants caused GWG and Defendant Ben LP to issue a press release titled "GWG Holdings and The Beneficient Company Announce Significant Expansion of Strategic Relationship". The press release quoted Defendant Jon Sabes as stating:

> Founding and building GWG has been the highlight of my business career to date. The opportunity to expand GWG's financial services platform with BEN and its leadership team exceeds my expectations. The time has come for the business of earning non-correlated returns from illiquid alternative assets to be taken to the next level of success – and BEN aligned with GWG is the team to do just this. While at the same time, our technology businesses - Life Epigenetics and YouSurance - need my full attention as we plan full operationalization in 2019.

99.    The April 16, 2019 press release quoted Defendant Heppner as stating:

> Our expanded relationship with GWG is a compelling next step for BEN, providing valuable financial, strategic and operational resources to launch our liquidity products at scale. We have established BEN as a distinct financial services platform, providing a comprehensive suite of innovative lending and liquidity products that are capable of meeting the rapidly growing liquidity demands from more than one million high net worth individual investors and small-to-medium institutional owners of alternative assets. Further, we are delighted to build an even stronger working relationship with GWG's employees and investor constituencies, as we collectively build a team that is second to none.

100.    On July 9, 2019, Defendants caused GWG to file its 2018 annual report on SEC Form 10-K, which was signed by Defendant Heppner. The 10-K stated:

> We are a financial services company committed to transforming the alternative
> asset industry with disruptive and innovative products and services. In 2018 and
> early 2019 we consummated a series of transactions (as more fully described
> below) with Beneficient that has resulted in a significant reorientation of our
> business and capital allocation strategy towards an expansive and diverse exposure
> to alternative assets . . . Beneficient's existing and planned products and services
> are designed to support the tax and estate planning objectives of its MHNW clients,
> facilitate a diversification of assets or simply provide administrative management
> and reporting solutions tailored to the goals of the investor who owns alternative
> investments.

101.    On March 27, 2020 Defendants caused GWG to file its 2019 annual report on SEC

Form 10-K, which was signed by Defendant Heppner. The 10-K stated:

> We are a financial services company committed to transforming the alternative
> asset industry with disruptive and innovative products and services. In 2018 and
> 2019 GWG consummated a series of transactions (as more fully described below)
> with Beneficient that has resulted in a significant reorientation of our business and
> capital allocation strategy towards an expansive and diverse exposure to alternative
> assets . . . Beneficient's existing and planned products and services are designed to
> support the tax and estate planning objectives of its MHNW clients, facilitate a
> diversification of assets or simply provide administrative management and
> reporting solutions tailored to the goals of the investor who owns alternative
> investments.

102.    The foregoing statements were rendered materially misleading by Defendants'

failure to disclose the material facts that (i) they intended to misappropriate GWG assets, (ii)

GWG's life insurance investment business had failed, and (iii) GWG could only repay prior

investors by issuing increasing amounts of securities to new investors. In essence, Defendants had

turned GWG into a Ponzi scheme.

## IX.    CLASS ACTION ALLEGATIONS

103.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased

or otherwise acquired securities of GWG between December 23, 2017 and April 20, 2022, both

dates inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from

the Class are Defendants, the officers and directors of Defendants Ben LP and FOXO, at all

relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

104.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Defendants caused GWG to issue over $1 billion in securities, and the Wall Street Journal reported that approximately 27,000 individuals purchased GWG debt securities known as L Bonds. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class. Members of the Class may be identified from records maintained by GWG or its brokers or transfer agents, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

105.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

106.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

107.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether Defendants' actions constituted a scheme to defraud investors;

(c)      whether statements made by Defendants to the investing public during the Class Period omitted material facts about the business, operations, and prospects of GWG; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

108.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.    LOSS CAUSATION

109.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

110.    Because of Defendants' wrongful conduct GWG is bankrupt, holders of its securities have not received payments to which they are entitled, and investors have purchased investments they would not have otherwise made absent Defendants' material misrepresentations and omissions.

111.    During the Class Period, Plaintiffs and the Class purchased GWG securities at artificially inflated prices. The price of GWG's securities significantly declined when the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## XI.    ADDITIONAL SCIENTER ALLEGATIONS

112.    The scienter of the Individual Defendants is imputable to Defendants Ben LP and FOXO because they were directors and/or officers of Defendants Ben LP and FOXO acting within the scope of their authority.

113. As alleged herein, Defendants acted with scienter because Defendants: knew that the public documents and statements issued or disseminated in the name of GWG were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws; and knew that GWG's L Bonds were risky, illiquid investments that were sold to retirees.

114. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding GWG, their control over, and/or receipt and/or modification of GWG's allegedly materially misleading misstatements and/or their associations with the GWG, Defendant Ben LP, and Defendant FOXO, which made them privy to confidential proprietary information concerning GWG, participated in the fraudulent scheme alleged herein.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE (*AFFILIATED UTE DOCTRINE*)

115. A Class-wide presumption of reliance is appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions and misrepresentations. Because this action involves Defendants' failure to disclose material adverse information regarding GWG's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here.

## XIII.   NO SAFE HARBOR

116.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer who knew that the statement was false when made.

## XIV.   FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5(a)–(c) Promulgated Thereunder
### Against the Individual Defendants, FOXO, and Ben LP

117.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

118.    During the Class Period, the Individual Defendants, FOXO, and Ben LP carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) operate as a Ponzi scheme; and (iii) cause Plaintiffs and other members of the Class substantial

losses. In furtherance of this unlawful scheme, plan and course of conduct, the above-mentioned Defendants, took the actions set forth herein.

119.    The above-mentioned Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) omitted to state material facts necessary to make their statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of GWG's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)—(c). All of the above-mentioned Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

120.    The above-mentioned Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about GWG's financial well-being and prospects, as specified herein.

121.    The above-mentioned Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of GWG's value, which included omitting to state material facts necessary in order to make the statements made about GWG and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of GWG's securities during the Class Period.

122.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors of GWG, Defendant Ben LP, and Defendant FOXO during the Class Period; (ii) each of

these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of GWG, was privy to and participated in the creation, development and reporting of GWG's internal budgets, plans, projections and/or reports; (iii) each of these defendants were advised of, and had access to, other members of GWG's management team, internal reports and other data and information about GWG's finances and operations at all relevant times; and (iv) each of these defendants were aware of their own and GWG's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

123.    The above-mentioned Defendants had actual knowledge of the omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material omissions were done knowingly or recklessly and for the purpose and effect of concealing GWG's prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of GWG's business, operations, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

124.    As a result of the failure to disclose material facts, as set forth above, the price of GWG's securities were artificially inflated during the Class Period. In ignorance of the fact that prices of GWG's securities were artificially inflated, and in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants and GWG during the Class Period, Plaintiffs and the other members of the Class acquired GWG securities during the Class Period at artificially high prices and were

damaged when GWG ceased making required payments on these securities, substantially destroying their value.

125.    At the time of said omissions, Plaintiffs and other members of the Class were unaware of the omitted material facts and believed the statements of the above-mentioned Defendants and GWG to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding GWG, which was not disclosed by the above-mentioned Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their GWG securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

126.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

127.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of GWG securities during the Class Period.

## XV.    SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

128.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

129.    The Individual Defendants acted as controlling persons of Defendants Ben LP and FOXO within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions as Directors, their ownership and contractual rights, participation in, and/or awareness of the operations of Defendants Ben LP and FOXO, and intimate knowledge of the material information concealed from the investing public, the Individual Defendants had the

power to influence and control and did influence and control, directly or indirectly, the decision-making of Defendants Ben LP and FOXO, including their participation in the fraudulent scheme alleged herein.

130.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Defendants Ben LP and FOXO and, therefore, had the power to control or influence the particular decisions giving rise to the securities violations as alleged herein, and exercised the same.

131.    As set forth above, Defendants Ben LP and FOXO and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of GWG's securities during the Class Period.

## XVI.    THIRD CLAIM

### Violation of Section 15(c)(1)(A) of the Exchange Act
### Against Defendant Emerson Equity

132.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

133.    During the Class Period, Defendant Emerson Equity was registered with the SEC and FINRA as broker-dealers pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

134.    As set forth above, Defendant Emerson Equity directly or indirectly, by the use of the means or instrumentality of interstate commerce, of the mails, or any facility of any national securities exchange, used or employed, in connection with the purchase or sale, or the inducement or attempted inducement of the purchase or sale, of securities otherwise than on a national

exchange, acts, practices, or courses of business that constitute a manipulative, deceptive, or other fraudulent device or contrivance.

135.    By reason of the foregoing Defendant Emerson Equity violated, and unless enjoined will continue to violate Section 15(c)(1)(A) of the Exchange Act [15 U.S.C. § 78o(c)(1)(A)].

136.    In particular, as set forth above, Emerson Equity violated Section 15(c)(1)(A) of the Exchange Act with their omissions that (i) GWG's L Bonds had not been rated by any bond rating agency, and (ii) GWG was operating at a loss during the Class Period. Further, as set forth above, Defendant Emerson Equity each violated section 15(c)(1)(A) of the Exchange Act with their material misrepresentations that GWG's L Bonds were a safe and suitable investment for retirees, despite the investment's illiquidity and GWG's failing business.

137.    Defendant Emerson Equity omitted such facts and made such misrepresentations in conversations with investors across the United States to induce or investors to purchase GWG's L Bonds in exchange for large commissions based on the number of L Bonds or amount of stock sold. As a direct and proximate result of the wrongful conduct of Defendant Emerson Equity members of the Class suffered damages in connection with their purchases of GWG's securities during the Class Period.

## XVII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## XVIII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  March 30, 2023                    FEDERMAN & SHERWOOD

By: */s/ William B. Federman*
William B. Federman, TBA #00794935
FEDERMAN & SHERWOOD
212 W. Spring Valley Road
Richardson, TX 75081
Telephone: (405) 235-1560
Facsimile: (405) 239-2112
wbf@federmanlaw.com

Joseph D. Cohen
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
jcohen@glancylaw.com

*Counsel for Plaintiffs*